## ATKISON v. DIXON, *Appellant.*

1. **Notice.** After examining the evidence in detail, the court concludes that the plaintiff and his grantor both had notice of the defendant's title before they purchased the land in controversy in this case.

2. **Defective Conveyance of Equitable Interest:** EXECUTION. A conveyance by the owner of an equitable interest in land of his title, though defective for want of a sufficient description of the

property, is not a nullity, but will pass the grantor's interest; and a sale under an execution issued upon a judgment, subsequently obtained against him, will be of no effect.

*Appeal from Bates Circuit Court.*—HON. WM. S. SHIRK, Judge.

REVERSED.

*W. P. Johnson, E. J. Smith & Riggs* for respondent.

*A. Henry* for appellant.

NAPTON, J.—This was an action of ejectment to re-cover lot 4, in block 11, in the town of Butler, Bates county. The answer set up an equitable defense and pleaded also the statute of limitations. The case was submitted to the court, and the finding of the court was against the equi-table title claimed by defendant, and against the adverse pos-session; and the judgment consequently was for plaintiff, from which defendant has appealed to this court.

Both parties claimed under Thos. Rice. The plaintiff relied on a deed, with warranty, from Rice to J. D. Wright, conveying the lot in question, in consideration of $120, dated May 16th, 1864, and recorded on the 13th day of June, 1864, and a quit claim deed from Wright and wife to himself in consideration of $150, executed on the 3rd day of December, 1868, and recorded on the 28th day of March, 1874. The defendant's equitable title was based on a title bond of Rice, the original and undisputed owner, made in October, 1857, acknowledging a sale to de-fendant, Dixon, for $750, and the payment of $400 in hand and his note for $350, due in December, 1857, and agree-ing on payment of the purchase money to make a deed. The plaintiff's title, as stated heretofore, was based on a deed from Rice, the owner, to one Wright, in May, 1864, and a quit claim deed from Wright, in 1868, and upon the failure of defendant to prove his payment in full of the purchase money. A variety of instructions were asked and given, which we do not propose to notice, since it is

clear that abstract propositions of law were not so much involved as the application of them to the facts in evidence.

That defendant, Lewis Dixon, purchased this lot in 1857, of Rice, the owner, is not disputed, and that he had a title bond for a conveyance when the purchase money was paid. That defendant, Dixon, took possession at that time, and that whatever possession there was ever since, if any, was by Dixon, as principal or agent for others to whom his equitable title passed, seems equally undisputed

This defendant, it seems, went off from Bates county during the war of 1861, and was disabled from active work since; but in 1867, after his return, he instituted a suit against Rice, the original owner from whom he bought, and Wright, who had a deed for the lot in controversy from Rice. In this suit he charges that he paid Rice in full, and the answer of Rice admits the payment of $400, and admits the payment of about $320 more on the note for $350, and admits that he sold to Wright for $120, but that he was convinced since the sale that he was mistaken, and offers to convey upon the payment of the balance which he claims to be still due. Wright's answer is to the same effect, and the judgment of the court was that there were $50 yet due, and that upon its payment a deed should be made. This judgment was in 1870. Before this suit was commenced, Dixon had returned from the South, and seems to have met a friend in Benton county named Yancey, to whom he sold this lot and other small pieces of land in Bates county for $900, but the description in the deed of the lot in controversy was lot 4, in block 11, in the county of Bates. The words "town of Bates" were omitted. The deed was executed on the 17th day of September, 1866, so that the suit subsequently brought in 1867 had for its object to enable him to convey the legal title to Yancey. On the 3rd day of September, 1873, Yancey and wife, by a quit claim deed, conveyed to Mrs. Elizabeth Dixon this lot and other prop-

erty in Bates county, some of which had been previously conveyed to Yancey by Dixon, for $2,500.

These are the principal conveyances, or attempted conveyances, and their dates. The oral testimony, however, will best explain their connection, and upon the facts disclosed or established by the evidence, the merits of the case depend. I copy from the record the testimony of the defendant, Dixon : I bought the lot (4 in block 11, Butler, Bates county, Mo.,) of Thos. Rice, in 1857 ; I went into possession at the time I bought it, and had actual possession till the war broke out in 1861; there was a building on the lot when I bought it—in fact there were two— a blacksmith shop and another unfinished building, which I had finished; in 1858 I rented it to a company of ten men for a printing office; Jacob D. Wright was one of the company; two men, named Green and Maxwell, run the office until some time in 1860 ; the company paid me but little rent, and I, finding the office was about to break up in 1860, attached the press and other parts of the office for rent; I was gone away during most of the time of the war; I was taken prisoner, and confined in prison about two years during the war; after the war the frame for shoeing oxen, which was attached to the blacksmith shop on the lot, remained there; it belonged to me; also the casting of the old printing press and fixtures remained on the lot; the building was burned during the war. I got very much in debt during the war, and was obliged to sell my property in order to pay my debts. I came up from Benton county, in this State, with Yancey, to visit my property in this county (Bates). I offered to sell this lot at that time to John Atkison, the plaintiff, and to Jacob D. Wright and others. In a conversation with Atkison, before I sold the lot to Yancey, I showed Atkison my title bond from Rice, which I had with me during the war. The time I was away from Butler I sent money here to pay taxes on my property.

Some time in 1866, I sold this lot, with other lands,

to Yancey; 40 acres of timber and a six acre tract, and the lot where Mills' shop now stands, all sold at the same time. Yancey was to pay me $900 for the property he bought of me; $400 he paid me, and paid the balance by assuming my debts in Benton county, and releasing me from them. He settled one note I owed James Summers of $110; one note I owed McIntire of $60; another note to a man named Bickey for $100; another that Yancey held, I don't now recollect how much it was; and one Dr. Shadwick held, but I can't remember how much it was. I don't know where Yancey got the money to pay me, or to pay my debts. I know he paid me $400, and I was released from $500 or over of my debts by him. Yancey was not my son-in-law at the time I sold to him my property in Bates county. I was security at that time for about $600. I sold to Yancey in September, 1866. I don't know when Yancey paid these debts. In 1867 Yancey built a blacksmith shop on the lot for a man named Neighbors; and the shop stood on the lot till the fall of 1875, when it was removed by the order of Elizabeth Dixon.

Some time after Yancey bought of me he moved back to Benton county, and left me in charge of the property as his agent. I rented the property as his agent, and collected the rents till some time in 1872. Yancey then sold the lot, with some other property, to Elizabeth Dixon, for $2,500. She paid him $600 down, and paid the balance some time before September, 1873, when she got her deed for it from him. I know she paid him all up in 1873, before she got her deed from Yancey. She owned 40 acres of land aside from her farm, which she sold and applied on what she owed Yancey. She also raised on her farm over 600 bushels of wheat in 1873, which she sold, and paid to Yancey the proceeds, $700. She also boarded all the hands Judge Clem and myself had during the time we were running the mill; board amounted to some $500. She also furnished the brick material in the court house in Butler, amounting to $500. She also sold about $500

worth of hogs in 1873, to Martin & Linn, the contractors who built the court house. At the time she bought of Yancey she paid him $550, $500 cash, (I counted it,) and $50 she let him have an order for on Mr. Brockman, and she let him have a wagon; and before he went back to Benton county she let him have some stock—two horses, one set of harness and two plows; this property, I should think, worth $250 or $300 at that time. Yancey was at this time my son-in-law, and had been carrying on the farm of my wife. I have always lived at home, that is, my wife and I have never been separated. I did not do any work on the farm. I directed the boys how to do the work as agent of my wife. I have not been able to work since the war. This sale by Yancey to my wife was in 1871 or 1872. I cannot remember dates well. Mrs. Dixon did not get a deed at the time she bought; she got a deed about a year afterwards, and some time after she got the deed, I can't say how long, there was something to do to it. They fixed it I believe sometime in 1873 or 1874. I brought suit against Rice and Wright to get a deed as my bond called for; I had made a warranty deed to Yancey, and I wanted to make my title good to him; I thought I had paid Rice up when I brought the suit. As I understood it, the judge said I had to pay Rice or Wright, or some of them, $50, and they were to make me a good deed to the lot. John Atkison told me that the $50 was coming to him, as he had bought out Wright's claim; he did not tell me that he had a deed from Wright; he offered me a quit claim deed from Wright, and I would not receive it because it was not a warranty deed such as my bond called for. Charles Denny paid $25 to plaintiff, Atkison, for me, to be applied on that $50 that was ordered to be paid by the court, and I let Atkison have thirteen bushels of rye worth $1 a bushel, and 150 pounds of flour worth $4, and four or five loads of squared stone, which he built in his house, worth $5.50 a load. I have paid him the $50, and more too; Atkison never paid me for the rye, flour or stone; I never asked

him for pay, as I thought it was to apply on the $50 to be paid to him. My wife never inherited any property or money; she had none, or but little, when I married her. This lot had no fence from 1861 to 1867 or 1868, and was vacant and unoccupied during that time, except the remnant of the printing press and ox-shoeing stall that was on it.

Chas. Denny was called by defendant and testified as follows: I knew of the suit between Dixon, Rice and Wright, and I know I paid John Atkison, this plaintiff, $25 of the judgment that Dixon was to pay in the case of *Dixon v. Rice and Wright.* Atkison informed me the $50 was coming to him, and I paid $25 for Dixon.

Defendant then introduced Alex. Patterson, who testified that he knew lot 4 in Butler, Bates county, Missouri; knew the lot in 1857 first; it was then claimed by Thomas Rice; my understanding was that in the winter of 1857 or spring of 1858, Rice sold it to Dixon, and Dixon had control of it till 1861, when the buildings on it were burned. The lot was left vacant till after the war; I understood that Maxwell occupied it as a printing office under Dixon, but don't know whether he rented from Rice or not; I came back to Butler after the war in 1866; there was a building on the lot before the war, used as a printing office, which was burned in 1861; Dixon, as I understood, has been in possession as owner, or agent for some one, since 1866; I don't know of my own knowledge anything about Dixon's sale of said lot to Yancey, or sale by Yancey to Mrs. Elizabeth Dixon; my understanding is that Dixon, and those claiming under him, have been in possession of said lot since 1857; I never heard his right to possession questioned until this suit.

V. B. Vandyke, as witness for defendant, stated: I have been acquainted with lot 4, in block 11, in Butler, since 1857; defendant, Dixon, was in possession of it when I first knew it; Thos. Rice built the first house I knew of being on it, in 1857; it was afterwards used as a printing

office by Dr. Maxwell, and part of it as a doctor's office; I think this was in 1858; this building was burned in 1861; I believe there was a blacksmith shop on it before the war, but don't know; I don't know who built the first building on it since the war, but believe it was a man named Neighbors; I wanted to buy the lot in 1867 or 1868, and learned that Jeremiah Yancey owned it; Yancey then asked $1,200 for the lot; I know that it was generally understood by the citizens of Butler at that time that it belonged to Yancey; the lot was worth $1,000 or $1,200 then.

Defendant then offered John A. Deviuny as a witness, who testified as follows: I know lot 4, block 11, in Butler; knew it before the war. I repaired a building on it for defendant, Dixon, in 1859. I think the building was used for a printing office in 1859, but will not be certain. The first building on it since the war was a blacksmith shop in 1868; this shop was taken away in 1875; the building on the lot was destroyed in 1861. It was generally understood that Dixon had possession of this lot; I never heard his right to the possession of this lot questioned till this suit; the value of the lot in 1868 was about $1,000

Defendant then offered Jacob D. Wright as a witness. who testified as follows: I know lot 4, block 11, in town of Butler; knew it before the war. I was one of a company that rented a building on that lot before the war for a printing office; we rented it of Dixon; one Maxwell run the printing office. The building was burned in 1861. I don't know anything of Dixon's claim to the lot after the war, till 1866; at that time I had a deed to the lot from Thomas Rice and wife; it was made in 1864. At the time I bought this lot from Rice I had no notice of Dixon's claim. Rice made me a warranty deed. I went to the recorder's office before I bought to examine the title, but I found the records were at that time at Jefferson City, so the clerk told me. I sold this lot to Atkison, plaintiff in the case; I made him a quit claim deed for $120, I had a warranty deed, and told him so; I found out afterwards

that Dixon claimed this lot; I think I made the deed to Atkison after Dixon brought his suit against me and Rice; blacksmith shop was built on the lot after the war. When I sold to Atkison I don't recollect to have told him that any one else owned the lot. I thought I owned the lot, and sold to Atkison after suit was brought by Dixon against Rice and Wright; I supposed Atkison knew as much about the title as I did. I made a quit claim deed after the determination of the suit between Dixon and Wright and Rice, to Dixon, and delivered the same to Atkison to be by him delivered to Rice on payment of $50, ordered to be paid by Dixon; the money was coming to Atkison because of the quit claim deed I had before that time made to him. I suppose the reason Dixon did not get the quit claim deed I made him, was because he did not pay the $50 coming to Atkison.

Plaintiff then, for the purpose of rebuttal, offered a deed which was read over the objection of defendant. This deed, made by one W. T. Smith, on the 2nd day of August, 1875, in pursuance of a sale by him, as sheriff, on execution issued January 9th, 1869, upon a judgment rendered the 25th day of October, 1867, in case of G. W. Sevier against Lewis Dixon, recites sale of lot 4, block 11, on the 7th day of September, 1869, to John Atkison, for $21. This deed is in the usual form, except that it purports to be made by him as the "late sheriff of the county of Bates," and is signed "W. T. Smith, (seal) late sheriff."

Defendant's objections to this deed were that Yancey owned the lot from 1866 to 1873, and plaintiff having closed his case, and relied on his quit claim deed from Wright, was bound to let the case be so decided, and this was not in rebuttal of anything; because Smith had no authority, as ex-sheriff, five years after his term of office, to make the deed; because the deed was made August 31st, 1875, more than one year after this suit was begun; and for the further reason that Smith, as sheriff, at and after the time he made the sale of this same lot in 1869, made

to plaintiff, Atkison, a deed in the usual form, but without any seal, which was then acknowledged and delivered for the same lot to Atkison; and in support of this, defendant introduced the record of the first deed by Smith, which was read in evidence without objection; and further, because when his office as sheriff expired in 1870, there was no unfinished business concerning the sale of this land by him; having disposed of it by the execution and delivery of the deed in 1869, he had no authority to make another deed now.

Plaintiff then read in evidence, over the objections of defendant, execution deed by N. B. Meek, sheriff, of this same lot made the 6th day of April, 1876, to plaintiff on execution upon a judgment rendered in the case of the State of Missouri to the use of Adam Beck against Jeremiah Yancey and T. Graves, on the 10th day of December, 1873; deed in usual form; consideration $70. Defendant's objections were, that the judgment was satisfied and paid off in full on the 25th day of March, 1864, on a previous execution, as shown by the records and the execution before read in connection with Luther Shobe's testimony; and, further, because the said lot, as shown in evidence, had been sold by Yancey to Mrs. Dixon September 3rd, 1873.

Plaintiff, in person, testified in his own behalf, that he was sheriff of Bates county from January, 1867, to January, 1869. The return made on the writ of execution in Lewis Dixon against Thomas Rice and J. D. Wright, is in the hand-writing of Deputy Sheriff Willard. I do not recollect just what the suit was for. I took a quit claim deed of the lot in question while I was sheriff, on the 3rd day of December, 1868, from Wright. I knew when and how the suit of Dixon against Rice and Wright was determined. I supposed my title fell with Wright's. I did not receive $25 from Charles Denny to apply on the $50. I tendered to Dixon Wright's quit claim deed to the lot Dixon refused to accept it. I also got from Dixon thirteen

bushels of rye, which I still owe him for.   I don't recollect whether or not Dixon told me about the sale of the lot by him to Yancey.   I do not recollect of Dixon ever offering to sell the lot to me.  I do not know anything about Dixon's occupying the lot before or after the war.   Wright told me that he had a warranty deed from Rice, and he bought Rice's interest, supposing it to convey full title.   ] bought it for that and nothing else.   I did not look at the record of deeds.

After a careful examination of this record both in the manuscript copy and the printed abstract, (which latter is 1. NOTICE.        essentially correct,) I confess my inability to conjecture on what ground the judgment of the circuit court was based.   Perhaps it was on the ground that the plaintiff was an innocent purchaser without notice, or that Wright was, from whom he bought.   Let us see how the testimony looks on that question.   The evidence of the defendant himself is remarkably clear, circumstantial and positive, and so full of minute details as to make contradiction very easy, if any mis-statement was to be found in it.   We are, of course, aware of the tendency of self interest to mislead a party in a suit, when testifying in his own behalf, even where the intentions are honest.   We do not propose to base our conclusions upon this testimony alone, but when in all important points it remains uncontradicted by any other witness, and is really corroborated by the whole tenor of the proof, on both sides, we assume it to be entitled to great weight.

The testimony of the plaintiff, which we have copied, is evasive.   He has no recollection of important facts— though he does not deny them.   He knew when and how the suit of Dixon against Rice and Wright was determined.   He then must have known of Dixon's equitable claim, for that was the only point in the suit.   "I did not receive," he says, "$25 from Charles Denny to apply on the $50."   This is no denial of his receipt of the money, but a denial of its receipt on account of the $50, which

the court found due from Lewis Dixon, but he does not
state on what other account it was received, or could have
been received. He admits that he tendered to Dixon
Wright's quit claim deed, and that Dixon refused to accept
it. Why should he have tendered to Dixon such a deed
if he had paid $150 for a deed from Wright? Wright, it
seems, bought of Rice for $120, and he bought of Wright
for $150, though there is no evidence on the part of Wright
or the plaintiff as to the sum really paid. When Wright
sold to the plaintiff, the plaintiff agreed that he would ten-
der Wright's deed to Dixon, if Dixon would pay the $50.
This is rather strange and unaccountable, if the sums ac-
knowledged in the deeds were the real sums of money
paid. Why should Wright pay $120, and plaintiff pay
$150 for deeds upon which they both concurred that only
$50 was due to make them nullities? This seems to show
that both knew the condition of the title from Dixon. He
admits the receipt of thirteen bushels of rye "which he
still owes him for," though he does not say there were any
mutual accounts between them. He does not recollect
about the flour, and says nothing at all about the stone,
and yet these items, according to the prices stated by de-
fendant, amounted in the aggregate to exactly $50 upon
the supposition that only four loads of stone were deliv-
ered. He does not recollect whether or not Dixon told
him of the sale of the lot to him by Rice, and offered to
sell the lot to him, nor of Dixon's sale to Yancey; but
Dixon swears positively that he offered the lot to him, and
showed him the title bond of Rice which he had brought
with him from the South. There is no contradiction in
this statement of plaintiff, of Dixon's testimony, but a
mere acknowledgment of bad memory on the part of
plaintiff, and Dixon is surely not to be distrusted on ac-
count of the bad memory of another witness.

The testimony of Wright is so contradictory to his
answer in the case of Dixon against Rice and Wright, that
I have rather concluded it must have been misreported or

nay be misunderstood.  He says in his testimony, as re-. ported, "I had no notice of Dixon's claim to the lot at the time I bought from Rice," yet he admitted that he rented the lot of Dixon before the war for a printing office, and surely must have known that Dixon claimed to be owner, or he would not have rented from him.  In his answer to the petition of Dixon against Rice and him, he admitted full knowledge of Dixon's claim.  In short, there can hardly be a doubt that the plaintiff and Wright, from whom he purchased, were fully acquainted with the defendant, Dixon's, purchase from Rice.  The plaintiff must certainly have known it, or he surely would never have tendered a deed to Dixon, as he admits he did, at the request of Wright from whom he bought.

As to the sheriff's deed made, in 1875, after this suit was brought, in pursuance of a sale on a judgment in 1867, and an execution in 1869, against Dixon for $21, it is clear that at both these dates Dixon had no legal or equitable interest in the lot sold, as he had previously conveyed it to Yancey. We do not understand that his mistake, or rather omission in his description of the lot rendered his deed a nullity, though undoubtedly it required correction by a court of equity.  He had no legal title at the time to convey. There are other objections to the deed which we deem unnecessary to notice, as the one referred to is sufficient.  The same objection applies to the deed of Sheriff Meek, on a judgment against Yancey, as the judgment was rendered after the lot had been conveyed by Yancey to Mrs. Dixon.

*2. DEFECTIVE CONVEYANCE OF EQUITABLE INTEREST: execution.*

It will be observed that no objections, whatever, are made to the good faith of the deeds to Yancey, or of the deed from Yancey to Mrs. Dixon.  The testimony of the defendant, Dixon, is on these points full and uncontradicted. The energy and industry of his wife appear conspicuous, and its results were so stated in detail as to excite unqualified commendation, and no attempt is made in any testimony on the other side to induce any question whatever

in relation to the validity or propriety of these conveyances. The movement of Yancey to Bates, after his marriage, is easily comprehended, and his subsequent return to Benton is nowise remarkable or unusual. We think the defense should have been sustained and a decree entered in accordance. We will, therefore, reverse the judgment for the plaintiff, and remand the cause, with directions to the circuit court to proceed in accordance with this opinion after Mrs. Dixon shall have been made a party. The other judges concur.